UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
| Title | Rosa Negrete et al v. Stanley Sniff et al | | |

Present: The Honorable **STEPHEN V. WILSON, U.S. DISTRICT JUDGE**

| Paul M. Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:** IN CHAMBERS ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [56].

## Introduction

This cases arises from the death of Julio Negrete, Jr. ("Negrete" or "Decedent"), who was allegedly killed by his cellmate, in the early hours of May 9, 2013, just after he arrived at Southwest Detention Center ("SDC"). Negrete's parents, Rosa Negrete and Julio Negrete, Sr., ("Plaintiffs") allege the County of Riverside, the Riverside County Sheriff's Department, and Riverside County Sheriff Stanley Sniff ("Defendants") violated Negrete's constitutional rights.

Currently before the Court is Defendants' motion for summary judgment. For the reasons stated below, the Court grants Defendants' motion.

## Procedural Background

On May 27, 2014, Plaintiffs filed a complaint against Defendants. (Dkt. 9.) On May 8, 2015, plaintiffs J.A.N., S.N., S.N., and H.N. filed a complaint against Defendants.[1] On August 31, 2015, the Court consolidated the two actions, with the low number case designated as the lead case. (Dkt. 97.)

Plaintiffs filed their operative Fifth Amended Complaint ("FAC") on January 16, 2015, adding

---

[1] Minor children, J.A.N., S.N., S.N., and H.N. are the biological children of decedent, Julio Negrete, Jr.

| | : |
|---|---|
| | Initials of Preparer |
| | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

Doe defendants. (Dkt. 49.) In the FAC, the Plaintiffs asserted five claims: (1) deliberate indifference to inmate health and safety under the 8th and 14th Amendments; (2) failure to provide timely medical care under the 8th and 14th Amendments; (3) negligence; (4) a survival action under 42 U.S.C. § 1983; and (5) conspiracy and obstruction of justice under 42 U.S.C. § 1985. (Dkt. 49.) On May 8, 2015, Defendants filed a motion for summary judgment as to the FAC or a summary adjudication of the issues. (Dkt. 56.) Plaintiffs' operative opposition, filed on July 16, 2015, waived all of their claims except two: (1) deprivation of familial relations under the Fourteenth Amendment and (2) municipal liability under *Monell*. (Dkt. 87.)

**Statement of Facts**

*Negrete Arrested and Transported to County Jail*

Negrete was arrested on the evening of May 8, 2013 for violating Health and Safety Code § 11378 (possession of a controlled substance for sale), § 11379 (transportation of a controlled substance for sale), and for an outstanding arrest warrant for violating Vehicle Code § 22152 (driving under the influence of alcohol or drugs) and he was transported to SDC. (Dkt. 57, ¶ 1.)

*County Policies*

SDC Inmate Classification Policies

When an inmate enters SDC, he is classified by the county.[2] (*Id.* ¶ 5.) The Riverside County Sheriff's Department Corrections Division classification policies are documented in policy 504.02. (*See* COR0563–70.) Under the policy, there are six levels of inmate classification, from level 1 to level 6. (COR0568.) Classification deputies are required to conduct classification interviews with inmates following booking to determine the appropriate classification. (COR0565.) Based on the information obtained from the classification interview, the classification deputy is required to complete a classification questionnaire and assign the inmate a classification level. (COR0567–8.) The classification system takes into account certain factors, including: the inmate's booking charges, prior history of convictions and arrests, gang membership, problems with other inmates, and related matters. (Dkt. 57, ¶ 5.)

---

[2] Sheriff Sniff had no personal knowledge of Negrete before his death and made no decisions related to Negrete before his death. (Dkt. 57, ¶ 11.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

Some aspects of the classification are based on a subjective assessment by the classification deputy based on his experience. (*See* Dkt. 101, Pendleton Dep. at 48:12–49:7.) For example, classification deputies must decide, based on his intuition and experience, whether an inmate's record indicates that they have serious institutional behavior problems. (*See id.* at 48:12–49:7; 49:20–50:11.)

Classification deputies are also authorized to override the classification level provided by the classification assessment matrix after providing a reason and receiving the approval of a sergeant. (COR0568–9.) The classification override policy provides that "[i]n cases where the classification deputy feels that the objective custody level does not truly reflect the custody risk of the inmate, the deputy may recommend an override; either higher or lower, to more accurately reflect the inmate." (COR0568.) Circumstances that might justify an upward override include multiple counts for an offense, high profile cases, and state parole holds or fugitive status. (COR0569.) Circumstances that might justify a downward override include "[p]hysical and/or medical conditions that lower the inmate's threat potential," absence of prior criminal history, and reliable patterns of behavior that suggest an inmate will follow the rules and benefit from jail programs. (*Id.*)

Reclassification may take place at the request of an inmate or any jail personnel. (COR0566.) It was not standard procedure for classification deputies to reclassify an inmate just because they were transferred from another jail. (Dkt 101, Pendleton Dep. at 64:1–6.) If an inmate did something to warrant reclassification, the policy was to reclassify the inmate at the facility where the conduct took place or if the inmate was transferred to another facility, at the new facility. (*Id.* at 64:7–22.) The county practice is to have an automatic reassessment whenever an inmate is involved in fight that results in a transfer. (*See* Dkt. 101, Taylor Dep. at 31:22–32:5.)

### Deputy Training Policies

Before being allowed to work in county jails, Riverside County Sheriff's Department policy requires that a deputy complete Basic Peace Officer Training or Corrections Basic Academy. (Dkt. 58-1, Taylor Decl. ¶ 2.) Basic Peace Officer Training is a 952 hour course designed to meet the minimum peace officer requirements established by the Commission on Peace Officer Standards. (*Id.*) Corrections Basic Academy is a 374 hour course designed to meet the minimum requirements of section 179 of the California Code of Regulations. (*Id.*) Deputies must complete a 72-hour orientation in jails generally and a one-day orientation in the jail to which they are assigned before they are allowed to work

:

Initials of Preparer

PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

alone. (*Id.* ¶ 3.) Deputies are also required to complete an 8-week training program with experienced deputies. (*Id.*) Deputies also have periodic briefings on policies and procedures in CRT briefings. (Dkt. 101, Packer Dep. 65:4–8.) When a deputy is being trained on policies, it is standard practice to review the policy itself and then give an example of proper procedure through a practical application of the policy. (Dkt. 101, McNamara Dep. at 78:11–25.)

Classification deputies were required to take a basic classification course before or shortly after joining the classification unit. (Dkt. 101, Pendleton Dep. at 26:19–27:11.) They would also receive on-the-job training from experienced deputies on how to complete inmate intake assessment classifications. (*Id.* at 50:12–51:3.)

### Security Check Policies

The Riverside County Sheriff's Department Corrections Division security log and check policy is documented in policy 502.10. Under the policy, the entire jail is to be checked every hour and deputies are required to physically observe every inmate during the check. (Dkt. 58-1, Ex. 3 at 1.) Security checks are to be documented in the Security Check Log. (*Id.* at 2.) If the security check is not completed within an hour, the deputy responsible for the security check is required to state a reason for the delay in the security log and inform his supervisor. (*Id.* at 1.) On-duty supervisors are required to review the security check logs at least twice every shift. (*Id.* at 4.) The security check did not require deputies to count inmates and runners did not have a policy of verifying how many inmates were assigned to a cell before conducting a security check. (Dkt. 102-1, 17, 30; *see* Dkt. 58-1, Ex. 3.)

### Staffing Policies

Riverside County jails are required to comply with staffing regulations contained in Title 15 of the California Code of Administrative Regulations. (Dkt. 58-1, Taylor Staffing Decl. ¶ 2.) Pursuant to the staffing plan requirement in 15 C.C.R. § 1027, the County submitted a staffing plan to the state Corrections Authority that was approved on April 30, 2013. (*Id.*) On May 8–9, 2013, there were thirty deputies of the rank of corporal or below, three sergeants, and some nurses staffed for the night shift. (*Id.* ¶ 3.) In the following day shift, there were thirty two deputies of the rank of corporal or below, four sergeants, and a number of other staff members on duty. (*Id.*)

The practice at SDC was to staff pods with a primary pod deputy and runner deputies. (*See* Dkt.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

101, McNamara Dep. at 73:5–23.) The SDC practice was also for primary pod deputies not to leave the pod office unattended. (*Id.* at 74:10–16.) If the pod runners were attending to another duty, the primary pod deputy could notify the runners over the radio that they needed to return to perform a security check. (*Id.* at 74:10–16.) The pod primary could also contact their supervisor to provide personnel or perform the security check. (*Id.* at 79:8–17.)

*Negrete Classified as Level-5 Inmate*

Negrete was classified as a level-5 inmate when he entered SDC. (Dkt. 57, 1–2.) Intake officers recorded that Negrete had spent seven months in county jails and ten years in state prison. (COR0129.) They also noted that he claimed an affiliation with the Brown Nation gang. (*Id.*) And Negrete told the intake officers that since his teen years he had "a bad heart failure" related to low oxygen. (*Id.*) The officers were also aware that Negrete had been arrested under § 11378 and § 11379. (*Id.*)

*Barrera Classified as Level-5 Inmate*

Chad Barrera ("Barrera") was classified as a level-5 inmate as of May 8, 2013. (Dkt. 57, ¶ 5.) Barrera received level-5 classification as early as September 28, 2007. (COR0175.)

Barrera was booked into the county system on April 20, 2012, on charges including murder. (Dkt 101-2, Ex. 14.) The classification deputy used an inmate classification assessment matrix to determine how to classify Barrera. His classification assessment indicated that he had four years served in state or federal prison and five to six served years in county jail. (*Id.*) The assessment found gang involvement and indicates the classification deputy reviewed his prior classification notes. (*See id.*) The worksheet found that his current offense was related to persons or weapons and that he had seven or more cumulative years in custody. (*See id.*) But he was classified at level 5 because the classification deputy found that he did not qualify as an inmate with "serious institutional behavior problems or history/risk for escape." (*Id.*)

His classification notes include disciplinary incidents prior to May 8, 2013. Barrera was disciplined for destroying jail property in October 2002. (COR0173.) Deputies found contraband matches in his cell in November 2012. (COR0176.) He was the main instigator in a multiple inmate assault over "housing issues" in January 2013 and rehoused at SDC. (*Id.*) The fight did not result in severe injuries. (*See* Dkt. 101, Pendleton Dep. at 67:17–23.) A deputy found "pruno" jail alcohol in

: _____

Initials of Preparer     PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

Barrera's property box in February 2013. (COR0176.) Barrera was involved in a fight in March 2013. (COR0177.) The fight did not result in severe injuries. (*See* Dkt. 101, Pendleton Dep. at 67:17–23.) He was involved in another fight initiated by other inmates, in April 2013. (COR0177.) The fight did not result in severe injuries. (*See* Dkt. 101, Pendleton Dep. at 67:17–23.) After the fight, deputies pulled Barrera out of his cell to conduct a search. (*Id.*) Barrera refused to comply with deputies and "turned on" them. (*Id.*) Deputies found pruno-making materials in his cell and a sharpened paperclip on Barrera's person. (*Id.*) Barrera was disciplined with the loss of commissary for four weeks, starting on May 9, 2013. (*Id.*)

*B-Pod Deputies*

Initially, there were three deputies assigned to B-Pod for the night shift on May 8–9, 2013, deputies Ybarra, Duran, and Packer. (Dkt. 102-1, 27.) Deputy Duran was primary pod deputy[3] and Packer and Ybarra were pod runners. (*See* COR0679.) Deputy Ybarra, was sent to C-Pod because of a staff shortage. (*See* Dkt. 102-1, 15.) Wednesday nights were generally demanding for all staff members because it was one of the nights where there was a clothing exchange. (*Id.* at 31–32.) Though deputy Duran entered thirteen security checks on the security log between 6:36 p.m. on May 8 and 5:51 a.m. on May 9, only two security checks were actually completed by deputy Packer, at 6:36 p.m. and at 5:51 a.m. (COR0674–78; COR0683.) Deputy Duran entered the security check entries in the security log before actually completing the security checks.[4] (*See* COR0673–4.)

*Negrete Assigned to Barrera's Cell*

Negrete was assigned to cell number 30 in the jail's B-Pod. Because he was a level-5 inmate, he was assigned to a cell with another inmate with the same classification level, Barrera. (Dkt. 57, ¶ 5.) Negrete entered his assigned cell at approximately 2:33 a.m. on May 9, 2013. (Dkt. 79, Ex. 8.) No other inmates entered the cell between that time and when deputies found Negrete's body. (*See* COR0049.) The video from the dayroom in Pod-B shows that at approximately 2:49 a.m., an inmate motions towards cell 30. (Dkt. 79, Ex. 8.) At 2:50 a.m. two other inmates walk over to cell 30 and look inside for

---

[3] Deputy Duran completed a correctional officer supplemental course in April 2009 and eight weeks of jail operations training once he arrived at SDC. (Dkt. 101, Hardin Dep. at 33:2–16.)
[4] Deputy Packer also admitted to this practice and asserted that is was a common practice followed by the majority of the staff. (COR0682.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

approximately 30 seconds. (*Id.*) At approximately 2:52 a.m. one of the inmates who had looked into the cell several minutes earlier, approached the cell again and looked in the cell again for approximately two minutes. (*Id.*) Deputy Duran entered a false entry for a security check at 2:58 a.m. (COR0676.)

*Discovery of Negrete's Body*

Deputies discovered Negrete's body in the course of attempting to take him to an interview. Negrete was scheduled to meet with an own recognizance (OR) clerk to determine whether the OR clerk would recommend Negrete's release. (Dkt. 57, ¶ 2.) At approximately 11:30 a.m. on May 9, 2013, deputies Montgomery and Rubio received orders to transport Negrete to his OR clerk interview. (*Id.* ¶ 8.) At 11:31 a.m. three deputies approached cell 30.[5] (Dkt. 79, Ex. 8.) When the deputies arrived at the cell, they only saw Barrera and directed him to come with them. (Dkt. 57, ¶ 8.) Barrera complied with the request. (*Id.*) On the way to the interview, Barrera appeared to be walking unusually and the deputies decided to conduct a strip search to determine whether he was carrying contraband. (*Id.*)

They did not find any contraband, but because they were now suspicious, they conducted a cell search for contraband. (*Id.*) When they conducted the cell search, they found Negrete's body under the lower bunk. (*Id.*) The deputies discovered Negrete's body at approximately 12:33 p.m. on May 9, 2013. (*Id.* ¶ 10.) Barrera had used two one-cubic-foot cardboard boxes (provided to inmates to store personal items) to obscure the view of the area under the bunk bed from the outside. (*Id.* ¶ 9.) After discovering Negrete's body, the deputies summoned medical aid, but efforts to revive him were unsuccessful. (*Id.* ¶ 10.)

*Coroner's Report*

The Riverside County Sheriff's coroner found that Negrete died from ligature strangulation that she classified as homicide. (COR0113.) Specifically, the coroner found that "[a] ligature mark approx 1/2" thick was noted around the front of Negrete's neck and traveled around the left side of his neck." (COR0115.) Death by strangulation would have occurred within one to two minutes of when the ligature was applied. (Dkt. 94-1, 1–2.)

**Legal Standard**

---

[5] The three deputies were Montgomery, Rubio, and Folia. (COR0695.)

Initials of Preparer  PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

*Summary Judgment*

Federal Rule of Civil Procedure 56 requires summary judgment for the moving party when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir. 1997).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The moving party may satisfy this burden by "'showing'— that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the moving party has met its initial burden, the nonmoving party must go beyond the pleadings and identify specific facts that show a genuine issue for trial. *See id.* at 323-24; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Only genuine disputes over facts that might affect the outcome of the suit under the governing law — *i.e.*, "where the evidence is such that a reasonable jury could return a verdict for the nonmoving party"— will preclude entry of summary judgment. *See Anderson*, 477 U.S. at 248.

*Fourteenth Amendment Familial Relations*

Cognizable Fourteenth Amendment claims require conduct "so egregious, so outrageous, that it may fairly be said to shock to contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). Government conduct is most likely to shock the conscience when the official acted with a purpose to harm, but deliberately indifferent conduct may also be cognizable in some instances. *Id.* at 848–50. Whether *deliberate indifference* or the more demanding *purpose to harm* standard applies depends on whether the circumstances indicate that actual deliberation is possible. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Because prison officials have the time to consider an inmate's welfare, the custodial prison situation should normally be judged under the deliberate indifference standard. *See Lewis*, 523 U.S. at 851-52. Thus, in a normal failure-to-protect claim, a plaintiff is "required to show by a preponderance of the evidence that (1) [the plaintiff] faced a substantial risk of serious harm, (2) the defendants were deliberately indifferent to that risk, and (3) the defendants' failure to act was a proximate cause of the harm that he suffered." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 665–66 (9th Cir.

| | : |
|---|---|
| Initials of Preparer | |
| | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

2015).

Whether the plaintiff faced a substantial risk of serious harm is a question of fact. "[T]he qualitative difference between the degree of risk that will result in liability . . . and that which will not, is a fact-bound inquiry." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 n.4 (9th Cir. 2013).

Deliberate indifference requires a subjective awareness of a serious risk and failure to adequately respond to that risk. Under the standard, a prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Whether an official possessed the requisite knowledge "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Grenning v. Miller-Stout*, 739 F.3d 1235, 1239 (9th Cir. 2014) (quoting *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000)) (internal quotations omitted).

Finally, the plaintiff must establish causation. A plaintiff must demonstrate that the defendant's conduct was the actual and proximate cause of harm. *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013). Cause in fact can be established through direct participation of the defendant or when an official sets in motion a series of events that the official knows or should know will create the constitutional injury. *Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2010), *vacated by* ––– U.S. ––––, 131 S.Ct. 1812, 179 L.Ed.2d 769 (2011), *reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011). If the defendant is one of the causes of the plaintiff's injury, the defendant will not be legally responsible if a superseding cause breaks the chain of causation. *Id.* at 1100–01. "If reasonable persons could differ over the question of foreseeability, summary judgment is inappropriate and the question should be left to the jury." *Id.* (internal quotations omitted).

"The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). Thus parents can pursue claims based on the loss of "companionship and society of their adult children" even when the loss was incidental to the state action. *Rentz v. Spokane Cnty.*, 438 F. Supp. 2d 1252, 1263–65 (E.D. Wash. 2006) (noting that the Ninth Circuit does not follow other circuits in requiring a more direct nexus between the death of the child and the parent); *see also Estate of Gonzales v. Hickman*, No. 05-660 MMM (RCX), 2007 WL 3237727, at *13 (C.D. Cal. May 30, 2007) ("The Ninth Circuit has also permitted family members to assert claims for violation of their Fourteenth Amendment familial association rights based on predicate violations of a

:

Initials of Preparer PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

decedent's Eighth Amendment right to be free from cruel and unusual punishment.").

*Municipal Liability*

A municipality is subject to liability when it deprives a plaintiff of their constitutional rights. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). But a municipality is not liable for the actions of its employees under a *respondeat superior* theory. *Id.* at 691. Instead, a plaintiff must demonstrate that a municipal policy "caused" the employee to violate the plaintiff's constitutional rights. *Id.* at 692. When a municipality adopts a formal policy that causes the plaintiff's injury, the plaintiff must prove that the municipality acted with the culpability required to prove the underlying violation, as if the municipality were a natural person. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1144 (9th Cir. 2012). When a plaintiff alleges that an informal policy caused their constitutional injury, they must first establish that the practice is "so permanent and well settled as to constitute a custom or usage with the force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (internal quotation marks omitted). Thus, an informal policy cannot ordinarily be established through a single constitutional violation or a few isolated incidents.[6] *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999). Instead, a plaintiff typically must prove that there was a pattern of similar incidents. *Castro*, 797 F.3d at 671.

**Application**

Plaintiffs seek to hold the County of Riverside liable based on its policies, customs, or practices.[7] (*See* FAC ¶ 14.) Plaintiffs essentially raise three arguments regarding county policies. First, Defendants had a pattern or practice of inadequately staffing SDC on Wednesdays, when clothing exchanges were taking place that caused deputies to fail to properly perform security checks and generally

---

[6] There are three exceptions to this general rule: liability can attach from an isolated violation when (1) the violation is caused by someone with final policymaking authority; (2) a final policymaker ratifies a subordinate's actions; or (3) a final policymaker acts with deliberate indifference to a subordinate's actions. *Christie*, 176 F.3d at 1241.

[7] In their opposition to Defendants' motion for summary judgment, Plaintiffs purport to waive all claims in their FAC except those based on "their right to familial relations under the Fourteenth Amendment" and those based on *Monell* liability. (Dkt. 87.) Though the Court recognizes that these are not distinct "claims," but rather a theory of standing and a theory of liability, it understands Plaintiffs to waive their claims based on state law. As Defendants have noted in several briefs, Plaintiffs have not named any defendants in their individual capacity. (Dkt. 56, 14; 89, 1–2.) Thus, they cannot maintain any theories based on individual constitutional violations that cannot be attributed to the County of Riverside under the principles of *Monell*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

ensure safety. (Dkt. 102, 1–3.) Second, Defendants did not train deputies to perform security checks adequately and several deputies admitted to entering security checks before they were actually performed and did not demonstrate a sound understanding of the policies. (*Id.* at 3–8.) Finally, Plaintiffs argue that the classification system was inadequate because it left many considerations and subjective assessments to the discretion of individual deputies without providing formal training and guidelines. (*Id.* at 8–10.)

Plaintiffs fail to establish a genuine issue of material fact regarding the county's liability. The fact that this unfortunate incident happened does not itself render Defendants' policies unconstitutional. Without establishing a pattern of incidents that would put Riverside County on notice of deficiencies in its policies, this incident cannot create municipal liability without more.

The undisputed evidence does not reflect that the county was aware of an issue of understaffing. Plaintiffs do not dispute that SDC's staffing policy complied with title 15 requirements generally or on the shifts in question. Instead, Plaintiffs rely on the statements of deputies that suggest that it was a "known aspect" that nights with clothing exchanges were busy for the deputies. (Dkt. 102-1, Ex. C at 58:22–59:24.) But Plaintiffs have not established a pattern of incidents coinciding with the dates of clothing exchanges or a policy so obviously deficient that it was likely to result in the violation of constitutional rights. *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1195 (9th Cir. 2002). Despite the staff being busy during the night shift in question, deputy Duran in line with procedure should have called another deputy or a supervisor to conduct a security check.

Plaintiffs' theories based on security log practices fail because they cannot establish causation or Defendants' knowledge. Plaintiffs cannot establish causation because the alleged custom of deputies filling in security logs before conducting security checks could not by itself have caused Negrete's injury. Assuming that the practice of deputies at SDC was to complete the security log entries in advance of the check, Plaintiffs have not established a direct causal relationship with the practice and Decedent's death. What is relevant is whether Defendants had informal policy of not conducting security checks pursuant to their written policy, not whether they had an informal policy of not completing security logs pursuant to their written policy. Plaintiffs do not allege that there was a pattern and practice of not conducting the security checks and have not established why a policy of conducting security checks once per hour would be constitutionally deficient.[8]

---

[8] Unfortunately, even if the Defendants' written policies of conducting security checks once per hour had been followed by deputy Duran, Plaintiffs have offered no evidence that a security check would not have been able to prevent Decedent's death.

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

Plaintiffs have not introduced evidence that the informal practices that they allege to fall below constitutional standards were widespread or known to policymakers at the time of Decedent's death. To establish municipal liability "some evidence of actual knowledge" on the behalf of the county is required. *Castro*, 797 F.3d at 674; *see also Frary v. Cnty. of Marin*, 81 F. Supp. 3d 811, 821 (N.D. Cal. 2015) (defendant's witness testified that he was aware of practice in question prior to the incident). Here, Plaintiffs' only evidence of the county's knowledge comes from reports generated after the incident.

Plaintiffs' reliance on the findings and recommendations of the civil grand jury convened to evaluate Riverside County Sheriff's Department policies (the "Grand Jury Report") to establish the county's knowledge of inadequacies in its policies is misplaced. The Grand Jury Report was issued on June 17, 2014. (Dkt. 87-1, Exs. A, B.) It focused on Sheriff's Department policies regarding personnel training, headcount, and security log and security check policies.[9] (*See id.*) The Grand Jury gathered information about the implementation of corrections practices by interviewing randomly selected jail personnel and reviewing internal documents. (*See id.* Ex. A, 2.) Though the Court provided Plaintiffs with the opportunity to conduct discovery on the issue of whether any of the conclusions in the Grand Jury Report were known to county officials prior to May 8, 2013, (*see* Dkt. 97.), Plaintiffs have failed to establish that any of the policy deficiencies identified in the report were known to the county prior to the incident. *See, e.g., Layton v. Bd. of Cnty. Comm'rs of Oklahoma Cnty.*, 512 F. App'x 861, 864 (10th Cir. 2013) (reports involving matters preceding inmate's death can be evidence of actual knowledge of deficiencies).

To the contrary, Defendants have established that many of the issues addressed in the Grand Jury Report are taken from the personnel investigation conducted in relation to Negrete's death. (*See* Dkt. 96, 4–6.) For example, the Grand Jury Report found that "[d]uring the course of this investigation, it was discovered that hourly security checks were not being done as mandated by Title 15, section 1027 of the

---

Even if deputy Duran had performed the falsified security check that he indicated in his security log, the uncontroverted medical evidence indicates that it would have been too late for a deputy to protect Negrete. Decedent entered cell 30 at approximately 2:33 a.m. and other inmates first began to look into the cell at 2:49 a.m. Given that death by strangulation from a ligature would take only one to two minutes, a security check that took place at 2:58 a.m. would not have come soon enough to intervene. Even if Defendants had conducted more frequent checks as Plaintiffs appear to suggest, (*see* Dkt. 102, 3.), Plaintiffs have not offered evidence that security checks are causally related to Decedent's death given the coroner's uncontroverted findings.

[9] The Grand Jury Report did not evaluate Defendant's classification policy. (*See* Dkt. 87-1, Exs. A, B.)

Initials of Preparer    PMC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:14-cv-01024-SVW-FFM | Date | November 16, 2015 |
|---|---|---|---|
| Title | *Rosa Negrete et al v. Stanley Sniff et al* | | |

California Code of Regulations and Division Policy." (Dkt. 87-1, Ex. A at 11.) But the basis for this finding was that "[o]ut of thirteen (13) security checks documented on the Security Check Log, only two (2) were actually performed in one (1) jail," and "[a] deputy made ten (10) separate false entries into the jail Security Check Log," and "[a] deputy failed to call other personnel to assist him resulting in security checks not being completed when he was alone." (*Id.*) The specific nature of these and other findings in the Grand Jury Report confirm that the grand jury drew its security check conclusions from the personnel investigation conducted after the incident. Without evidence of prior knowledge by Defendants, deputy Duran's failure to ensure that security checks were entered into the security log and actually completed cannot be the basis for municipal liability.

Plaintiffs' classification system allegations similarly fail because Plaintiffs cannot establish that Defendants were aware of risks created by their classification system that they failed to correct. The generalized risk of being harmed by another inmate is not sufficient to create municipal liability. And at most, Plaintiffs' expert disagrees with the level of discretion provided to deputies and the weight placed on various factors. *See Batista v. Columbia Cnty.*, No. 3:12-CV-00920-HZ, 2013 WL 5675214, at *6 (D. Or. Oct. 17, 2013) (plaintiff's interpretation of classification system does not create a genuine issue of material fact); *Cotta v. Cnty. of Kings*, 79 F. Supp. 3d 1148, 1174 (E.D. Cal. 2015) (plaintiffs failed to provide facts to establish that failure to require classification deputies to investigate legal proceedings was an obvious risk). Plaintiffs have not provided evidence of why the limited discretion provided to classification deputies creates a serious risk of harm to inmates and that the County of Riverside was aware of these purported shortcomings. Because Plaintiffs have failed to provide evidence that Defendants were deliberately indifferent to a serious risk to inmate safety, summary judgment is appropriate. *See Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 193 (7th Cir. 2013) ("The attack by his cellmate is not enough to establish that the *policy itself* systematically exposed inmates like him to serious risk of harm.").

**Order**

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment.

SO ORDERED.

:

Initials of Preparer     PMC